\*\*E-Filed 9/15/2011\*\*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| THRESSA WALKER, GEETA SINGH, and KAI IHNKEN,<br><br>              Plaintiffs,<br><br>   v.<br><br>COUNTY OF SANTA CLARA; SANTA CLARA VALLEY MEDICAL CENTER; HOLLISTER BREWSTER; ALFONSO BANUELOS; and DOLLY GOEL; and DOES 1 through 50, inclusive,<br><br>              Defendants. | Case Number 5:10-cv-4668 JF<br><br>**ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION AND MOTION FOR TEMPORARY RESTRAINING ORDER/ORDER TO SHOW CAUSE AND PRELIMINARY INJUNCTION**<br><br>Re: Docket No. 40 |

      The three plaintiffs in this case all are former or current medical personnel at Santa Clara Valley Medical Center ("SCVMC"). They assert numerous federal and state law claims based upon adverse treatment they allegedly suffered at SCVMC as a result of their complaints about substandard patient care. Plaintiff Geeta Singh, a cardiologist, also contends that she experienced gender discrimination at SCVMC and that her complaints about such discrimination also led to retaliation against her. As relevant to the present application, Dr. Singh claims that one aspect of the retaliation was SCVMC's decision to transfer her from its

central specialty facility to an ancillary clinic where she no longer can perform most of her former duties. Dr. Singh seeks a temporary restraining order ("TRO") and preliminary injunction restoring her to her former office and job responsibilities. For the reasons discussed below, the application will be denied.

## I. BACKGROUND

According to her complaint and moving papers, Dr. Singh has worked for SCVMC as a non-invasive cardiologist since 1998. Between 2006 and 2010, Dr. Hollister Brewster, the Chief of Cardiology, and Dr. Peter Gregor, a cardiologist, subjected her to sexually harassing comments, and she received unequal pay and other disparate treatment because of her gender. In December 2009, Dr. Singh complained about the discriminatory conduct to Santa Clara County's Equal Opportunity Officer.

Between 2007 and 2009, Dr. Singh also complained on numerous occasions about substandard patient care at SCVMC. In February 2007, she sent a letter to SCVMC's Chief Medical Officer about the substandard care of a cardiac patient. Between February and June 2009, she wrote reports on three patients whom she believed had received substandard care, and she helped to submit these reports to a third-party organization—the Joint Commission on Accreditation of Healthcare Organizations—which consequently downgraded SCVMC from full accreditation to conditional accreditation. In October 2009, she complained about substandard care to SCVMC's Compliance Privacy Officer as well as to the Santa Clara County Executive. Dr. Singh believes that in response to her complaints her superiors and colleagues repeatedly yelled at, belittled, and otherwise humiliated her from March 2009 to the present.

On October 12, 2010, Dr. Singh took medical leave as a result of workplace stress. On October 22, 2010, Dr. Singh filed this action against SCVMC, Santa Clara County, and doctors at SCVMC. On November 8, 2010, Dr. Alfonso Banuelos, the Chief Medical Officer, stated during a meeting with cardiology staff that Dr. Singh "won't be back" to work at SCVMC. On July 5, 2011, SCVMC in fact permitted Dr. Singh to return to work. However, Banuelos reassigned Dr. Singh from the Valley Specialty Center ("VSC") to the Valley Health Milpitas

clinic ("VHM"), a satellite, primary-care, outpatient facility.

The reassignment does not affect Dr. Singh's salary or benefits. Dr. Singh claims, however, that the reassignment precludes her from performing 90% of the responsibilities she had at VSC. At VHM, she can no longer provide any inpatient services, nor can she perform specialized echocardiograms (namely, transthoracic echocardiograms, transesophogeal echocardiograms, 3-D echocardiograms, definity contrast echocardiograms, and stress echocardiograms) or cardiac procedures (namely, pericardiocentesis, electrical cardioversion, and the insertion of pacemakers, catheters, and arterial lines). Dr. Singh also contends that the reassignment to VHM dramatically limits her ability to attend divisional meetings and educational conferences and prevents her from teaching Stanford medical students, as she was able to do at VSC.[1]

Dr. Singh contends that this curtailment of her responsibilities is causing her to lose essential cardiology skills and threatens her certifications by the National Board of Echocardiography, her appointment as Clinical Associate Professor of Medicine at Stanford Medical Center, and her hospital staff privileges.

## II. DISCUSSION

The standard for issuing a TRO is the same as that for issuing a preliminary injunction.[2] *Brown Jordon Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Hawaii 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). A preliminary injunction is "an extraordinary remedy that may only be

---

[1] Before her reassignment, Dr. Singh served as the cardiologist preceptor for the ambulatory clerkship of Stanford medical students.

[2] Unlike a motion for a preliminary injunction, however, an application for a TRO requires a movant to notify her opponent of the motion *on or before the day* of filing. See Civil L. R. 65-1(b). Dr. Singh did not provide such notice until two days after her application. Despite this defect, this Court will consider the application, lest there by any doubt about the merits of the parties' arguments. Defendants also urge this Court to reject the application under Fed. R. Civ. P. 65(b)(1)(B), but this rule applies only when an adverse party receives no notice at all before the issuance of a TRO. Here, the defendants have had notice of the application and ample opportunity to respond.

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate [1] 'that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

### A. Irreparable Harm

"Regardless of how the test for a preliminary injunction is phrased, the moving party must demonstrate irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing grant of preliminary injunction because the movant failed to offer evidence of irreparable harm). It is not enough that the claimed harm be irreparable; it also must be imminent. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Mem'l Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980). A movant must demonstrate the threat by probative evidence, *Bell Atl. Bus. Sys., Inc. v. Storage Tech. Corp.*, No. C-94-0235, 1994 U.S. Dist. LEXIS 4471, at *9 (N.D. Cal. Mar. 31, 1994) (denying preliminary injunction motion because movant failed to show sufficient evidence of threat of irreparable harm), and conclusory affidavits are insufficient. *Am. Passage*, 750 F.2d at 1473; *see also K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972).

Based on the record before it, the Court finds and concludes that Dr. Singh's alleged injuries are neither imminent nor irreparable. She also has failed to demonstrate that they are probable. Her three certifications from the National Board of Echocardiography do not expire until June 2018. To renew each certification, Singh must perform a minimum number of echocardiograms of the relevant type for two of the three years preceding her application.[3]

---

[3] For re-certification in transthoracic echocardiograms, the National Board of Echocardiography requires a cardiologist to perform at least 400 such echocardiograms per year for two of the three years preceding the application for re-certification. Re-certification in transesophogeal echocardiograms requires at least 50 such echocardiograms per year for two of

4

Thus, her ability to perform echocardiograms could not affect her re-certification prospects until June 2015. Similarly, Dr. Singh's professorship at Stanford Medical Center does not expire until 2014. To determine whether to renew a professorship, Stanford assesses a candidate's letters of reference and abilities as a clinician and teacher. Although Dr. Singh understandably is concerned that a hiatus in her teaching will negatively affect her renewal prospects, it is far from obvious that it will cause her to lose her professorship three years from now. Similarly, Dr. Singh's inpatient and outpatient hospital staff privileges are effective until May 2013. Dr. Singh believes that SCVMC will refuse to renew her inpatient privileges because she does not presently perform inpatient services at VHM, but she has not provided any concrete evidence to support this claim.

While this Court recognizes Dr. Singh's concern that cardiology skills are particularly vulnerable to atrophy from disuse, this is not the kind of imminent, irreparable injury that calls for preliminary injunctive relief. Through efficient case management, the Court is confident that it can expedite a resolution of this case on its merits well before Dr. Singh suffers a permanent and irreparable injury.

**B. Likelihood of Success on the Merits, Balance of the Equities, and Public Interest**

Because Dr. Singh has failed to demonstrate that she is likely to suffer irreparable harm, a prerequisite for obtaining injunctive relief, the Court need not address the remaining preliminary injunction factors.

### III. ORDER

The application for a TRO and motion for preliminary injunction are denied.

**IT IS SO ORDERED.**

DATED: September 15, 2011

JEREMY FOGEL
United States District Judge

---

the three preceding years; and re-certification in stress echocardiograms requires at least 100 such echocardiograms per year for two of the three preceding years.

5